UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
―――――――――――――――――――――――――――――
                                             :
In re:                                       :    Chapter 11 (Involuntary)
                                             :
STILLWATER ASSET BACKED                      :
OFFSHORE FUND LTD.                           :    Case No. 12-14140 (ALG)
                                             :
              Alleged Debtor.                :
―――――――――――――――――――――――――――――:

MEMORANDUM OF DECISION


APPEARANCES:

HERRICK, FEINSTEIN LLP
2 Park Avenue
New York, New York 10016
      By: Arthur G. Jakoby, Esq.
          Paul A. Rubin, Esq.
          Frederick E. Schmidt, Jr., Esq.
          Justin B. Singer, Esq.
*Attorneys for Alleged Debtor,*
*Stillwater Asset Backed Offshore Fund, Ltd.*

FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
      By: Douglas E. Spelfogel, Esq.
          Richard Bernard, Esq.
          Mark J. Wolfson, Esq.
          Katherine R. Catanese, Esq.
*Attorneys for Petitioning Creditors*


**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

      On October 3, 2012, Eden Rock Finance Master Limited, f/k/a Fortis Prime Fund

Solutions Custodial Services (Ire) Ltd re KBC as G1 (ERFF) ("ERFML"), Eden Rock

Unleveraged Finance Master Limited f/k/a Fortis Prime Fund Solutions Custodial Services (Ire)

Ltd re KBC as G1 ("ERUFML", and together with ERFML, the "Eden Rock Petitioners"), ARP Structural Alpha Fund, f/k/a Fortis (Isle of Man) Nominees Limited a/c 80 000 323 ("ARPSAF"), and ARP Private Finance Fund, f/k/a Fortis (Isle of Man) Nominees Limited a/c 80 000 357 ("ARPPFF", together with ARPSAF, the Absolute Petitioners", and collectively with the Eden Rock Petitioners, the "Petitioning Creditors") filed an involuntary Chapter 11 case against Stillwater Asset Backed Offshore Fund Ltd. ("Stillwater" or the "Alleged Debtor").  On November 7, 2012, the Petitioning Creditors filed an emergency motion, pursuant to § 303(g) of the Bankruptcy Code, seeking the immediate appointment of a trustee to manage the Alleged Debtor pending the entry of an order for relief.  A hearing was conducted on October 12, 2012.  The motion was denied on the ground, among others, that the Alleged Debtor had not had any ongoing business or operations for several years, and there was no showing of the need for extraordinary relief.  An order was entered on October 30, 2012, denying the motion for the appointment of a trustee but confirming that no action out of the ordinary course would be taken by current management without notice to the Petitioners.

The Alleged Debtor thereafter contested the involuntary petition, seeking an order, pursuant to 11 U.S.C. §§ 105(a), 303, and 305, (i) dismissing the petition, (ii) imposing sanctions against the Petitioning Creditors, and (iii) scheduling a damages hearing and directing the Petitioning Creditors to post a bond pending such hearing.  The Petitioning Creditors oppose this relief, and both parties have filed voluminous papers in support of their positions.  An evidentiary hearing on the matter was conducted on December 18, 2012.  Two other creditors, who go by the name Cannonball and Cannonball II, claim to be similarly situated, and purport to be funds holding in excess of $8.2 million of redemption claims, have filed a joinder to the

opposition to the dismissal motion and state that they support the involuntary petition.

*FACTS*

The following facts were either stipulated by the parties or appear from the record of the hearing held on December 18, 2012, and the documents admitted into evidence.

<u>Stillwater and the Petitioning Creditors' Investments and Redemptions</u>

Stillwater was organized under the laws of the Cayman Islands as an offshore "exempted" investment company. It was originally formed to invest in securities and financial instruments, with a primary focus on loan participations consisting of the following: loans secured by residential and commercial properties; loans to law firms working on a contingency fee basis, secured by an interest in the potential recovery; insurance premium financial loans; and miscellaneous loans, including corporate loans.

All of Stillwater's investments were in the form of participation interests in assets held by another fund, Stillwater Asset Backed Fund LP (the "Onshore Fund"), a Delaware limited partnership also managed by Stillwater Capital Partners, Inc. (the "Asset Manager"). The Asset Manager made all management decisions for both Stillwater and the Onshore Fund; its principals are Jack Doueck and Richard Rudy. Stillwater's participation interests in the investments made by the Onshore Fund were documented in a series of substantially identical Master Loan Participation Agreements (the "Master Loan Participation Agreements") between Stillwater and the Onshore Fund. All of the investments were illiquid and most required active management and/or additional capital to maintain value.

The Eden Rock Petitioners invested more than $24 million with the Alleged Debtor and the Absolute Petitioners invested more that $9 million. In connection with their investments, the

3

Petitioning Creditors received copies of a Confidential Private Placement Memorandum (the "PPM"), amended as of May 2005, and Stillwater's Memorandum and Articles of Association, amended and restated by Special Resolution dated 10 June 2005 (the "Articles").

Like many other funds, particularly those that invested in real estate, Stillwater was hard hit by the financial collapse in 2008. Starting in June 2008, the Petitioning Creditors, along with many other investors, redeemed all of their investments in Stillwater (the "Redemptions). The Petitioning Creditors' redemptions aggregated $35,934,811.74, divided among them as follows: $23,009,320 to ERFML; $3,603,080 to ERUFML; $5,433,318.26 to ARPSAL; and $3,899,093.48 to ARPPFF. Stillwater does not dispute that after redemption, the Petitioning Creditors became creditors of the Alleged Debtor in the amount of the redemptions and that, absent payment by Stillwater, either in cash or in kind, the Petitioning Creditors would be creditors of Stillwater with standing to commence an involuntary bankruptcy case.

The Alleged Payment to the Petitioning Creditors

Stillwater was unable to pay cash to the Petitioning Creditors or many other investors who redeemed their shares in the aftermath of the financial crisis. On December 18, 2009, Stillwater issued to each of the Petitioning Creditors documents, each entitled Assignment and Participation Certificate (the "Certificates") and Share Transfer Forms (the "Share Transfer Forms") on account of the Redemptions.[1] It is Stillwater's position that this constituted a distribution in kind ("DIK") to the Petitioning Creditors of their proportionate interest in the participations that Stillwater, in turn, owned in the Onshore Fund's investments. It is

---

[1] The Certificates each confirmed that "the holder hereof is the owner of the Fund assets identified on Schedule A hereto and assigned to you pursuant to the terms hereof." The Share Transfer Forms each stated that Stillwater "in satisfaction of a redemption in kind does hereby . . . transfer to the investor . . . the number of shares in the capital of [a special purpose vehicle]."

4

uncontested that the Certificates and the Share Transfer Forms were the only documents issued by Stillwater in connection with the DIK. It is uncontested that the Onshore Fund never executed or issued any documents in connection with the DIK, and the record does not disclose that the Onshore Fund has ever recognized any rights that any of the Petitioning Creditors may have had under the Master Loan Participation Agreements.

Notwithstanding the alleged "distribution in kind" to the Petitioning Creditors, about a month later, on January 20, 2010, Stillwater entered into an "asset purchase agreement" with another fund named Gerova Financial Group Ltd. ("Gerova"), a Bermuda corporation. Stillwater sold all of its assets to or merged into Gerova (the "Gerova Transaction") but its creditors received no cash or other property in return (except that a substantial fee was paid to the Asset Manager). The purpose of this transaction, according to the Alleged Debtor, was to provide liquidity to Stillwater's investors in the form of restricted Gerova stock that would convert, over a six-month period, to unrestricted common shares of Gerova tradable on a public exchange. Subsequent to the Gerova Transaction, each of the Petitioning Creditors was offered an interest in Gerova in exchange for the assets that they had purportedly been issued in the DIK; although it appears that many or most of the other redeeming investors accepted this proposal, the offer was never accepted by the Petitioning Creditors. It is the Alleged Debtor's position that Stillwater did not sell Gerova the participation interests that had been distributed to the redeeming creditors, or at least to the redeeming creditors like Petitioners who refused to accept the Gerova novation; however, there is no evidence that Gerova has ever recognized the purported interest of the minority.

According to Mr. Rudy, one of the principals of the Asset Manager, the Gerova

5

Transaction left the creditors who did not accept the novation with an illiquid participation interest in investments once owned by the Stillwater Onshore Fund but now owned by Gerova, but he also explained at length that he, as the Asset Manager of Stillwater, has never – despite years of effort – been able to obtain substantial information from Gerova's principals about the status of the transferred investments.[2] It is not disputed that the Gerova Transaction left Stillwater without any assets whatsoever, and approximately one year after the Gerova Transaction, Stillwater's independent directors resigned.

The Gerova Transaction was such a fiasco in producing for Stillwater investors either cash or a liquid security that, eventually, the Asset Manager (on behalf of itself and related entities) and Gerova executed a Letter of Intent dated as of April 20, 2011 to unwind it (the "Unwind"). However, the transactions related to the Unwind have never taken place, and the possibility of a closing has been complicated by the fact that Gerova is currently subject to a winding up proceeding in Bermuda and is ostensibly controlled by a joint provisional liquidator (the "JPL") appointed by the Bermuda Court. On October 22, 2012, this Court granted the JPL's Petition seeking recognition of the Bermuda proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code. *See In re Gerova Financial Group, Ltd.*, 482 B.R. 86, 96 (Bankr. S.D.N.Y. 2012).[3]

On March 8, 2011, prior to the execution of the Letter of Intent for the Unwind, the Eden

---

[2] Subsequent to the Gerova Transaction, Gerova transferred all of the real estate investment assets previously owned by the Alleged Debtor to a Gerova affiliate, Net Five at South Beach LLC ("Net Five") (Stip. of Facts #31). There is no evidence Net Five has ever recognized or is even aware of the Petitioning Creditors' alleged ownership of an interest in those holdings, whether as a "participation in a participation" or as SPV shareholders. Needless to say, Petitioners have never received an accounting or any proceeds related to those transactions.

[3] In those proceedings, the JPL has complained that he had not received any cooperation from Gerova's management and had been unable to take control of Gerova's books and records.

6

Rock Petitioners filed a lawsuit in New York state court against several defendants, including Gerova and Stillwater (the "State Court Lawsuit").[4] On May 3, 2011, the defendants filed a motion to dismiss the State Court Lawsuit that was denied in part and granted in part by decision of that Court dated December 22, 2011. Separately, on March 22 and April 21, 2011, class actions charging securities fraud were filed in the United States District Court for the Southern District of New York against, among others, Stillwater, the Investment Manager and Gerova (the "Stillwater Class Actions").[5] A third federal class action brought by investors in Gerova with no connection to Stillwater has been consolidated with the Stillwater Class Actions. The parties to the securities litigation and some of Stillwater's and Gerova's creditors agreed to mediate, and a mediation before JAMS was commenced on September 20, 2011 and has been ongoing.

A mediation session was scheduled for October 4, 2012 and, prior to that date, a proposal was distributed by the mediator to the parties. On that date, the Petitioning Creditors filed this chapter 11 involuntary petition against Stillwater but the Eden Rock Petitioners nevertheless participated. As of the hearing on the Involuntary Petition, the mediation was ongoing and the parties had not come to agreement.

*DISCUSSION*

There is no question that the Alleged Debtor is not paying its debts as they mature. For the purpose of the current motion, the parties stipulated that the Alleged Debtor is generally not paying its debts as they come due (Stipulation of Facts #40), which is one of the conditions to

---

[4] *Eden Rock Finance Fund L.P. et al. v. Gerova Financial Group, LTD.*, Index No. 650613/2011.

[5] *In re Stillwater Capital Partners Inc. Litigation*, Case No. 11 Civ. 737 (SAS), and *Maurice Hanan, Albert Chehebar, Isaac Shehebar, and Prudent Partners, LP v. Gerova Financial Group, Ltd., Stillwater Capital Partners, LLC, Stillwater Capital Parnters, Inc., Jach Doueck, Richard Rudy, Gary T. Hirst, Michael Hlavsa, Tore Nag, Keith Laslop, and Arie van Roon*, Case No. 11 Civ. 07107 (SAS).

7

relief under an involuntary bankruptcy petition pursuant to § 303 of the Bankruptcy Code.[6] In fact, its financial condition is far worse. It has no ongoing business, having transferred its property to another fund named Gerova. Its only apparent goal is to unwind the Gerova Transaction and recover its former assets from Gerova, a possibility that Gerova's management may have once contemplated but that is more problematic as a consequence of Gerova's having been placed in an involuntary liquidation proceeding in Bermuda. In any event, even if the Alleged Debtor is successful in recovering any of its assets from Gerova, its only goal is to liquidate them for the benefit of Stillwater's creditors. A third party, Kinetic Partners, will have duties of an uncertain nature, but the liquidation will seemingly be carried out by the Asset Manager, subject to the review of a committee of creditors.[7]

Nevertheless, although the Alleged Debtor is defunct as an ongoing enterprise and its only goal is to carry out an asset liquidation, its current managers vigorously resist a court-supervised liquidation under the aegis of the U.S. Bankruptcy Code. They have raised two defenses to the involuntary petition. First, although they admit for purposes of the instant proceeding that the Alleged Debtor was not, on the petition date, generally paying its debts as they come due, they assert that the debts to the Petitioning Creditors were paid in full by a distribution to them of an alleged "distribution in kind." This implicates the second clause of §

---

[6] See § 303(h), which provides, in relevant part, that where an involuntary petition is controverted, relief can be ordered only if, among other things
    (1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount.

[7] Richard Rudy, one of the two principals of the Asset Manager, testified that the goal of the ongoing mediation is to recover Stillwater's investments from Gerova and liquidate them with the assistance of Kinetic Partners, which he believes is acceptable to creditors as a reputable administrator of these types of investments. The record is not clear as to how much control Kinetics or a creditors' committee would have over the liquidation.

303(h)(1), which provides that an entity cannot be forced into an involuntary proceeding if the debts it is generally not paying are "subject to bona fide dispute as to liability or amount." It also implicates § 303(b)(1) of the Code, which provides that an involuntary petition can only be filed, in the case of a non-partnership debtor with more than 12 creditors, "by three or more entities, each of which is either the holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount." Second, it is asserted that the Alleged Debtor is in the midst of an out-of-court workout acceptable to the "vast majority" of its creditors, and that this Court should abstain or dismiss this case in favor of a non-judicial alternative. For the reasons stated below, neither of these defenses can withstand scrutiny.

Debt Subject to Bona Fide Dispute

As quoted above, § 303(b)(1) requires that a petitioning creditor hold a non-contingent claim that is not "the subject of a bona fide dispute as to liability or amount," and § 303(h) provides that an entity can be placed into involuntary bankruptcy proceedings if it is not paying its debts as they come due, "unless such debts are the subject of a bona fide dispute as to liability or amount." In the case at bar, it is stipulated that the Alleged Debtor is not paying its debts generally as they come due, but it is claimed by the Alleged Debtor that the debts of the Petitioning Creditors are the subject of a bona fide dispute. An objective test is applied to determine whether there is a bona fide dispute. *Key Mechanical Inc. v. BDC 56 LLC (In re BDC 56 LLC)*, 330 F.3d 111, 117 (2d Cir. 2003), abrogated on other grounds by *Adams v. Zarnel (In re Zarnel)*, 619 F.3d 156 (2d Cir. 2010). This formulation requires a court to "determine whether there is an objective basis for either a factual or a legal dispute as to the validity of the

debt." *BDC 56 LLC*, 330 F.3d at 117, citing *In re Busick*, 831 F.2d 745, 750 (7th Cir. 1987). A debtor's subjective belief or intent does not satisfy its burden. *Id*. A bona fide dispute, therefore, is present if "there is either a genuine issue of material fact that bears upon the debtor's liability or a meritorious contention as to the application of law to undisputed facts." *Id*., citing *In re Lough*, 57 B.R. 993, 997 (Bankr. E.D. Mich. 1986). The rationale for the objective standard, as made clear by the legislative history, is "to disqualify a creditor whenever there is any legitimate basis for the debtor not paying the debt, whether that basis is factual or legal." *Id*. A debtor should not be forced to pay a legitimately disputed debt or be pressured to pay that debt by the commencement of an involuntary bankruptcy case. *Id*.

While a court is called upon to determine the presence of a bona fide dispute, it is not called on to resolve such dispute. *Id*. This does not preclude a court, however, from addressing the merits of a dispute, and it "may be required to conduct a limited analysis of the legal issues in order to ascertain whether an objective legal basis for the dispute exists." *In re Rimell*, 946 F.2d 1363, 1365 (8th Cir. 1991). A court may, in its discretion, hold an evidentiary hearing. *BDC 56 LLC*, 330 F.3d at 119. The burden of proof shifts in that the petitioning creditors must first establish a prima facie case that there is no bona fide dispute; then the burden shifts to the putative debtor to show the existence of such a dispute. *Id*. at 118.

The foregoing principles may be applied to the facts of this matter as follows. The Alleged Debtor admits that the Petitioners, each of whom redeemed its units in the Alleged Debtor years ago, became creditors rather than equity holders in the amounts set forth above. *See* Stipulation of Facts #17 ("Absent payment by the Alleged Debtor, either in cash or in kind, the Petitioning Creditors would be creditors of the Alleged Debtor in the foregoing amounts.").

There is thus no question as to "the validity of the debt." *In re BDC 56 LLC*, 330 F.3d at 117. According to the Alleged Debtor, the bona fide dispute arises out of the transmittal to these creditors of "Assignment and Participation Certificates," dated December 18, 2009. The Certificates "confirmed" that the holder was the holder of the Fund assets listed on an attached Schedule A, namely (i) 24 loan participations in investments made by the Onshore Fund and (ii) certain shares of a new special purpose vehicle, called Stillwater AB Offshore Funding, Ltd. (the "SPV"), "which owns membership interests in Stillwater Funding LLC (the "Law Firm SPV") and indirectly participates in certain loans and loan participations held by the Law Firm SPV. . . . " It is not contested that this document and another piece of paper that purported to be a "Share Transfer Form" transferring to the Petitioning Creditors a certain percentage of the stock of the SPV "were the only documents issued by the Alleged Debtor in order to effectuate the DIK [Distribution in Kind]." Stipulation of Facts #20.

The Alleged Debtor asserts that the distribution to the Petitioning Creditors of these two documents was authorized under the Alleged Debtor's Articles and the governing law, and satisfied its debt to them in full. Neither contention can be sustained.

    A. The Stillwater Articles, the PPM, and Cayman law.

According to the PPM, redemptions of shares are governed by the Articles and Cayman Island law. *See* PPM, p. 33 (providing that redemptions of shares were to be "in accordance with and subject to the applicable provisions of [the Articles] and the laws of the Cayman Islands."). The PPM explained the right to substitute "assets in specie" for cash as follows:

> The Fund may redeem Shares in cash or, in the sole discretion of the Board of Directors, through in-kind distribution of portfolio securities, the fair market value of which would satisfy the redemption request. PPM, p. 34.

11

In the section of the Articles concerning "Redemptions," article 46 provided:

> Amounts payable to a Redeeming Shareholder in connection with the redemption of Shares will be paid in cash (unless the Directors determine to pay the Redemption Price (or any amount thereof) by way of delivery of assets in specie) and normally will be posted or sent by wire transfer upon the Redeeming Shareholder's request and at his expense.

The PPM thus authorized the Board to redeem with "portfolio securities," and the Articles authorized the Directors to pay "by way of delivery of assets in specie" instead of in cash.

"Portfolio" as used in connection with "securities" has been defined as "the various securities or other investments held by an investor at any given time." BLACK'S LAW DICTIONARY (9th ed. 2009). The "delivery of assets in specie" means delivery "in the same or like form" or "in kind." BLACK'S LAW DICTIONARY, 867 (9th ed. 2009). *See also* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2187 (1st ed. 1981) (defining the phrase "in specie" as "in the identical form and without alteration or substitution"). Instead of the delivery of a security that the Alleged Debtor held in its portfolio, or even something that could be called an "asset in specie," the Petitioning Creditors received an equity interest in (i) a new fund set up to hold some of the investments made by the Alleged Debtor and (ii) an undivided interest in the Alleged Debtor's participations in some of the investments made by the Onshore Fund.

As to the interest in the SPV, the Petitioning Creditors had, at most, no more than they had before – a claim against assets of the Alleged Debtor for amounts owed them on account of their redemptions. In a letter to redeeming investors in July 2009, Stillwater management described a proposed payment in kind option then being discussed (the creation of a special purpose vehicle to hold all of Stillwater's assets) and admitted: "[i]t will resemble and feel like being invested in the main fund (just like you originally were), except that the PIK vehicle will

return any and all money (after loan servicing and protection of existing collateral) to redeemed investors as capital comes back in." Pet. Ex. 38, p.2.  The creation of a SPV to liquidate assets is merely the dedication by an existing debtor of its assets to the payment of debts, not an actual payment of debt by way of "portfolio securities, the fair market value of which would satisfy the redemption request," or the "delivery of assets in specie."

Similarly, the proposition cannot be sustained that the Petitioning Creditors received portfolio securities or "a distribution in kind" by the transmittal of a piece of paper that purported to give them a slice of some of the Alleged Debtor's investments.  Indeed, as holders of a purported investment slice, the Petitioning Creditors seemingly had less than they would have had as creditors of Stillwater.  In a letter to Redeeming Creditors dated December 11, 2009 (the "December 2009 Letter"), seven days before the so-called distribution, Mr. Rudy wrote that creditors who did not choose the alternative "SPV Option" would receive "a *pro rata* interest in such Fund assets equal to the aggregate redemption payment due to such Redeemer." Pet. Ex. 33, p. 2. It warned, however, that

> Fund Assets distributed pursuant to the Direct Asset Option will not be managed by the Investment Manager, and, as such, Redeemers choosing this option . . . will be responsible for all administrative and management functions with respect to such Fund Assets.
> . . . Redeemers will have to make their own decision whether to fund additional advances to preserve the value of assets and underlying collateral without the benefit of the Investment Manager's expertise and of the potential availability of reserves attributable to management of the SPV.  If Redeemers electing the Direct Asset Option do not make such additional follow on advances required from time to time to preserve asset values and to meet anticipated and actual expenses and liabilities associated with distributed Fund Assets, such Redeemers may see their ultimate realization from those assets decline. . . .

Pet. Ex. 33, pp. 2-3.

The December 2009 Letter informed redeemers of some of the problems with the

13

distribution but apparently did not inform the Redeeming Creditors that the Alleged Debtor had no authority in any event to distribute a slice of its investments in the Onshore Fund. The Master Loan Participation Agreements between the Alleged Debtor and the Onshore Fund provided that the Alleged Debtor's participations could "not be divided, sub-participated or fractionalized by the Participant [the Alleged Debtor] in any manner." Pet. Ex. 4, § 2.2. Section 7.5 of the Master Agreement provided that "any disposition of any interest in this Agreement or in the Participation Interest in violation of any of the provisions hereof shall confer no rights on the transferee." Taking the documents at face, after the alleged "distribution in kind" of a slice of Stillwater's investments in the Onshore Fund, the Petitioning Creditors had no rights at all in the allegedly transferred assets.

Furthermore, within a month of the purported "distribution in kind," the Petitioning Creditors' position was further undermined. On January 20, 2010, about a month after the alleged DIK, Stillwater merged with and transferred control over its assets to Gerova, previously known as Asia Special Situation Acquisition Corp. Although many of Stillwater's redeeming creditors accepted an offer to become holders of a Gerova security, the Petitioning Creditors did not. At best, therefore, they became holders of (i) a minority putative equity interest in investments now controlled by another entity that, according to Mr. Rudy, has refused to provide information about the investments even to Stillwater management; and/or (ii) a slice of investments previously owned by the Onshore Fund and now owned by Gerova, which slice was assigned in violation of the Onshore Funds' Master Participation Agreement and has never been recognized by Gerova. According to the Alleged Debtor, the foregoing *legerdemain* paid the Petitioning Creditors in full and has left them only with a claim against Gerova. The Alleged

14

Debtor states in its papers to this Court

> It is indeed unfortunate that the Petitioning Creditors have not yet received any proceeds from the DIK Asset Slices. But, to the extent that any proceeds of those assets have been converted, as suggested by the Petitioning Creditors, their claim would likely be against Gerova, whose chapter 15 case is currently pending before this Court, not the Alleged Debtor.

Alleged Debtor's Reply Memo (¶ 58).

The question is thus whether the transmittal of a piece of paper that purports to pay a redeeming creditor an undivided percentage of some of the debtor's assets collected into a special purpose fund, and a slice of other assets that could not by their terms be further sub-divided, satisfied, under Cayman law, a requirement that the creditor receive payment in full in portfolio securities or *in specie*. In another case in which a Cayman fund attempted to carry out a similar scheme, the answer was clearly in the negative. In *In re FIA Leveraged Fund*, (April 18, 2012) No. FSD 0013 of 2012 at p. 26-28 (ASCJ) (Cayman Is.), another Cayman-based fund disputed an involuntary petition filed by redeeming creditors and claimed that the creditors had been paid *in specie* as permitted under the Articles, or at least that there was a "genuine" dispute regarding payment that would constitute a defense to the involuntary petition under Cayman law. Even though the Articles of the fund in that case gave the fund's board "sole discretion" to determine the value of the assets to be distributed, the Cayman Chief Justice determined that the redeeming creditors had not received a distribution of securities "in specie" or indeed any value at all by the transfer of a wholly illiquid, purported interest in other assets of the fund. The Court held that the offering memorandum there did not give the directors the absolute right to redeem

with assets that were commercially worthless.[8] The Alleged Debtor attempts to distinguish *FIA* on the ground that, in that case, the distribution was of an interest in an option that would be worthless absent the payment of a costly exercise price, and that the *FIA* fund cherry-picked assets. *Reply* ¶ 72. There is ample evidence in this case that the assets allegedly distributed to the Petitioning Creditors require substantial investment and management to have or retain any value. Moreover, although the Alleged Debtor may not have cherry picked assets, it divested itself of all of its assets within a month of its distribution to redeeming creditors, thereby purporting to leave the Petitioning Creditors as creditors of Gerova whom Gerova has never recognized.

The Petitioning Creditors have adequately borne their burden of demonstrating that the alleged distribution in kind was not effective, under governing Cayman law, in satisfying the debt to the Petitioners, in whole or in part, by transmittal of portfolio securities or assets *in specie*.

B.  The Bankruptcy Code

Under these circumstances, there is no objective basis for concluding, under U.S. law, that the debt to the Petitioning Creditors is subject to bona fide dispute within the meaning of § 303 of the Bankruptcy Code. The conclusion here is the same as in *In re Paper I Partners, L.P.*, 283 B.R. 661 (Bankr. S.D.N.Y. 2002), where involuntary petitions were filed in New York against limited partnerships, one of which was formed under the laws of the Turks and Caicos Islands, B.W.I. The putative debtors asserted that their debts to the petitioning creditors had

---

[8] The *FIA Leveraged Fund* decision is Ex. R to Docket entry No. 38, Exhibits to Petitioning Creditors' Objection to Motion to Dismiss. The decision is apparently now on appeal.

been satisfied by the issuance of a "promissory security" entitling the creditors to a future payment, and that this was authorized by the debtors' charters. The Court rejected the contention that a bona fide dispute as to payment could be created under § 303 by the transfer of an illiquid promissory security that gave the creditor no more than it already had – its proportionate share of an interest in the debtor's assets.

The Alleged Debtor also observes that the Eden Rock Petitioners brought a lawsuit in New York State court, individually and derivatively, against Stillwater, Gerova and certain of their principals, and that judgment has never been entered for the Eden Rock Petitioners against Stillwater. The fact that litigation is ongoing related "to a petitioning creditor's claim is insufficient to rebut its prima facie validity." *See In re Vitaminspice*, 472 B.R. 282, 293 (Bankr. E.D. Pa. 2012), citing *In re Red Rock Rig 101, Ltd.*, 397 B.R. 545 (10th Cir. BAP 2008); *see also In re AMC Investors, LLC.*, 406 B.R. 478, 486 (Bankr. D. Del 2009) (holding that there is no requirement that a petitioning creditor obtain a state-court judgment in order to have standing to file an involuntary petition under § 303 of the Bankruptcy Code). Moreover, the Eden Rock lawsuit asserted claims sounding in fraud as well as contract, and the principal action bearing on the instant case was the New York court's refusal to dismiss the contract action brought by the Eden Rock Petitioners against Stillwater. The failure of the Petitioning Creditors to obtain judgments against Stillwater does not, alone, provide an objective basis for concluding that their debts are subject to bona fide dispute.[9]

---

[9] It is also irrelevant that the New York Court denied Eden Rock's motion for a temporary receiver of Gerova's business and assets on the ground that it had not made a clear "evidentiary showing" that such "drastic" relief was "necessary for the protection of the parties" and avoidance of "irreparable loss." Decision of Hon. Bernard J. Fried, *Eden Rock Fin. Fund L.P. et al. v. Gerova Financial Group Ltd, et al.* As mentioned above, this Court also denied Petitioners' motion for an interim trustee on the ground they had not shown the need for such extraordinary relief. Neither decision is probative of the question whether there is a bona fide dispute as to

Abstention

The Alleged Debtor also maintains that the Court should exercise its discretion to abstain or dismiss the involuntary petition pursuant to § 305(a)(1) of the Bankruptcy Code. Section 305(a)(1) of the Bankruptcy Code provides that

> [t]he court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if –
> (1) the interests of creditors and the debtor would be better served by such dismissal or suspension.

There is no question that § 305(a)(1) "was designed to be utilized where, for example, a few recalcitrant creditors attempted to interfere with an out-of-court restructuring that had the support of a significant percentage of the debtor's creditors." *See In re Board of Directors of Multicanal S.A.*, 314 B.R. 486, 522 (Bankr. S.D.N.Y. 2004), citing H.R.Rep. No. 95-595, 95th Cong., 1st Sess. 325 (1977); S.Rep. No. 95-989, 95th Cong. 2d Sess. 35 (1979); and *In re Wine & Spirits Specialties of Kansas City, Inc.* 142 B.R. 345, 347 (Bankr. W.D. Mo. 1992). There is also no question that abstention may be proper where, as here, the debtor is an entity formed under the laws of, or doing business in, a foreign country. *See GMAM Investment Funds Trust I v. Globo Comunicacoes e Participacoes S.A. (In re Globo Comunicacoes e Paricpiacoes S.A.)*, 317 B.R. 235, 255-257 (S.D.N.Y. 2004) (where the court sustained the involuntary petition against a foreign entity but suggested that abstention pursuant to § 305 might be proper if it would further the interests of debtor and creditors and it were established that there was an out of court restructuring satisfactory to the vast majority of creditors).

The record on these motions does not establish that these salutary provisions should be

---

Stillwater's payment of its debt to Petitioners.

applied in this case. In the case at bar, the workout relied upon by the debtor is a mediation, conducted in connection with class action litigation that may be most deeply concerned with rights to existing insurance policies. There has been no proof that the mediation is nearing a conclusion, or that the Gerova liquidator or the court in Bermuda with jurisdiction over the Gerova liquidation will accept its results, if there ever are any results. The Alleged Debtor asserts that the "vast majority" of its creditors are supportive of the mediation, but it also claims that all or nearly all of its creditors except the Petitioners and Cannonball accepted the proposal to become creditors of Gerova. The only remaining creditors of Stillwater may be those supportive of the instant involuntary petition. In any event, one goal of the mediation appears to be the Unwind of the Gerova Transaction, and if this is to take place, it would be very useful for the Stillwater estate representative to be armed with the avoidance and related powers of a U.S. bankruptcy trustee.

     Both parties appear to assume that after an order for relief, there would be the appointment of an independent trustee for Stillwater – the Petitioners assume that one is necessary and the Alleged Debtor argues that a trustee would impede or preclude a workout of the type contemplated by the mediation. However, the Petitioners filed an involuntary chapter 11 case. The appointment of a trustee in an involuntary chapter 11 case does not appear to be automatic even after the entry of an order for relief. *See* 2 COLLIER ON BANKRUPTCY ¶ 330.29 (16th ed. 2012). The parties have leave to argue this issue further; however, there is no reason to conclude that the appointment of a trustee for the Stillwater creditors would necessarily make the mediation more problematic, rather than providing the Stillwater creditors the same type of independent representation that the Gerova creditors already have.

19

<u>Other Relief</u>

It follows from the above that the Alleged Debtor is not entitled to sanctions against the Petitioning Creditors or to damages on account of the filing of an improvident involuntary petition.

*CONCLUSION*

The Petition is granted. The Petitioning Creditors are directed to settle an order on five days' notice to the Alleged Debtor's counsel and to the United States Trustee. The parties should address the type of relief sought in connection with the form of order to be settled, including the question of the appointment of a chapter 11 trustee. The Court will hold a further hearing on this issue if requested by either party.

Dated: New York, New York
      January 17, 2013

                                              **s/Allan L. Gropper**
                                              UNITED STATES BANKRUPTCY JUDGE